**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **AM/NS CALVERT LLC**<br>1 AM/NS Way<br>Calvert, Alabama 36513<br><br>*and*<br><br>**AM/NS CALVERT RECEIVABLES LLC**<br>1 AM/NS Way<br>Calvert, Alabama 36513<br><br>Plaintiffs,<br><br>v.<br><br>**PARAGON INDUSTRIES, INC.**<br>3378 West Highway 117<br>Sapulpa, Oklahoma 74066<br><br>Defendant. | ) | CASE NO.<br><br>JUDGE |

## COMPLAINT

Plaintiffs AM/NS Calvert LLC ("AM/NS Calvert"), a Delaware limited liability company, and AM/NS Calvert Receivables LLC, also a Delaware limited liability company ("AM/NS Receivables," and collectively with AM/NS Calvert, "Calvert"), by and through their undersigned counsel, file this Complaint against Defendant, Paragon Industries, Inc. ("Paragon"), an Oklahoma corporation, and alleges as follows:

## NATURE OF THE ACTION

1. Paragon owes Calvert over $31.5 million, plus interest for steel delivered to Paragon and consignment inventory. This includes more than $15.4 million, plus interest, for steel products delivered to Paragon and over $16.1 million in Calvert inventory on consignment with Paragon.

2. Calvert seeks: (a) payment for Paragon's past due invoices; (b) payment for Paragon's mishandling of Calvert's consignment inventory; (c) a full and complete reconciliation of all consigned inventory in Paragon possession; (d) contractual pre-judgment interest; and (e) all costs and expenses, including reasonable attorneys' fees, incurred in connection with this action.

**PARTIES**

3. AM/NS Calvert is a Delaware limited liability company and has its principal office and place of business at 1 AM/NS Way, Calvert, Alabama 36513. AM/NS Calvert is a producer of high-quality steel products for a variety of industries, including the energy industry. AM/NS Calvert's members are corporate entities with citizenships in Delaware, the Grand Duchy of Luxembourg, and Japan.

4. AM/NS Receivables is also a Delaware limited liability company, and it also has its principal office and place of business at 1 AM/NS Way, Calvert, Alabama 36513. AM/NS Receivables is a wholly owned subsidiary of AM/NS Calvert.

5. Paragon is an Oklahoma corporation and has its principal place of business at 3378 West Highway 117, Sapulpa, Oklahoma 74066. Paragon is a producer of metal pipes for a variety of industries, including the oil industry.

**JURISDICTION AND VENUE**

6. This Court has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332(a). This is a civil action between Plaintiffs, Calvert, whose members are citizens of Delaware, the Grand Duchy of Luxembourg, and Japan, and Defendant, Paragon, a citizen of Oklahoma, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. No Party to this action is a citizen of the State of Illinois, nor of the same State (except for AM/NS Calvert and AM/NS Receivables).

8. Venue and personal jurisdiction are proper in this Court because the operative agreements—Calvert's October 1, 2021 Terms and Conditions of Sale (the "Terms & Conditions") attached as **Exhibit A**, and the May 8, 2023 Consignment Agreement (the "Consignment Agreement") attached as **Exhibit B**—contain forum-selection provisions favoring this Court, among other appropriate fora:

> JURISDICTION. BUYER, ACTING FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY LITIGATION ARISING FROM OR RELATED TO THIS AGREEMENT. SUBJECT TO SECTION 26, BUYER EXPRESSLY AND IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN CHICAGO, ILLINOIS, AND WAIVES THE RIGHT TO ASSERT THAT ANY ACTION IN ANY SUCH COURT IS IN THE IMPROPER VENUE OR SHOULD BE TRANSFERRED TO A MORE CONVENIENT FORUM.

(**Ex. A**, Terms & Conditions ¶ 27), and

> 8.6 Choice of Law and Jurisdiction. This Agreement shall be interpreted and enforced solely under and in accordance with the laws of the State of Illinois without regard to any conflict-of-laws statutes or equivalent thereof, whether of the State of Illinois or those of any other state, except where any given matter is exclusively governed by U.S. federal laws. The parties agree to the exclusive jurisdiction of the state and federal courts located in Illinois.

(**Ex. B**, Consignment Agreement § 8.6.)

## FACTUAL BACKGROUND

### I. Terms & Conditions and Invoices

9. Paragon conducted business with Calvert in which Calvert manufactured steel goods ordered by Paragon and Paragon paid Calvert for the goods.

10. In its Credit Agreement, Paragon agreed to be bound by Calvert's terms and conditions of sale:

Applicant 1) certifies that the information contained herein is true and correct; 2) authorizes ArcelorMittal Sales & Administration LLC to contact references provided herein; and 3) agrees to be bound by ArcelorMittal Sales & Administration LLC's terms and conditions of sale located at the link below: https://usa.arcelormittal.com/-/media/Files/A/Arcelormittal-USA-V2/what-we-do/price-list/2020_Terms-Sale.pdf

Authorized Signature [signature]
(Print Name) Derek Wachob
Title CEO Date 10/12/2022

(Paragon Credit Agreement, attached in redacted form as **Exhibit C**.)

11. Between January 4, 2023 and May 10, 2024, Paragon was billed for products manufactured and delivered by Calvert pursuant to purchase orders issued by Paragon at its specific instance and request.

12. In summary, the value of the invoiced products at issue in this case is $15,482,327.54, plus interest.

13. In addition to the agreement in the Credit Applications, Paragon purchased the products pursuant to invoices (the "Invoices"), which were also governed by the "Terms & Conditions." Each Invoice expressly provided that:

THIS INVOICE IS FOR YOUR ORDER CONDITIONED ON YOUR ACCEPTANCE OF ARCELORMITTAL USA LLC'S TERMS AND CONDITIONS OF SALE AVAILABLE FOR REVIEW AT HTTPS://NORTHAMERICA.ARCELORMITTAL.COM/SUPPLIER-RESOURCES. Thank you for your business.

14. Pursuant to the Terms & Conditions, Paragon agreed that if it failed to timely pay the amounts agreed upon, the full purchase price for all amounts still owing under the Invoices would become immediately due and payable for products already delivered or in process. (**Ex. A**, Terms & Conditions ¶ 16.)

15. Also pursuant to the Terms & Conditions, Paragon agreed to "be liable for [Calvert's] reasonable attorneys' fees and other costs incurred in the collection of amounts owed by [Paragon] or in enforcing this security interest." (*Id.*)

16. Additionally, pursuant to the Terms & Conditions, Paragon consented to contractual interest accruing on invoices paid after the net due date at the lesser of the prime rate

plus three percent (3%), or the maximum allowable contractual interest rate under law, whichever is less. (*Id.*, ¶ 20.)

17. The Terms & Conditions further provide that these transactions will be governed by, construed under, and enforced pursuant to the exclusive application of the laws of the State of Illinois. (*Id.*, ¶ 25.)

## II. <u>The Default By Paragon</u>

18. Paragon accepted all products sold pursuant to the Invoices without protest; however, it failed to timely remit payments and defaulted on the Invoices and its stated account with Calvert.

19. The total amount due under the Invoices for products delivered and accepted by Paragon is $15,482,327.54, plus interest.

20. Paragon has failed to remit the $15,482,327.54, plus interest, for products delivered pursuant to the Invoices.

## III. <u>Defendants Refuse Demand for Payment</u>

21. On April 1, 2024, Calvert sent Paragon a demand letter in which Calvert demanded: (1) full repayment of Paragon's overdue outstanding receivable balance as of that date; and (2) that all consigned inventory covered by Calvert's perfected security interest remain untouched.

22. In response to this letter, Calvert and Paragon agreed to a payment plan in which Paragon agreed to make weekly payments of at least $250,000.00 to Calvert.

23. After making the first few payments, Paragon failed to make payments in accordance with the payment plan. As of July 24, 2024, Paragon was $2,750,000.00 in arrears under the payment plan.

24. A second demand letter was sent in which Calvert demanded that Paragon pay the outstanding $2,750,000.00 in unpaid "payment plan" obligations by August 5, 2024.

25. After Paragon failed to make a payment, Calvert extended its internal deadlines to act until August 19, 2024, to allow Paragon to made another payment of $250,000.00.

26. Paragon failed to make any further payments

27. Thus, Calvert has a claim against Paragon in the amount of $15,482,327.54, plus interest.

## IV. The Consignment Agreement

28. On May 8, 2023, Calvert and Paragon entered into the Consignment Agreement, pursuant to which Calvert agreed to consign $16,112,893.86 worth of products with Paragon.

29. Pursuant to the Consignment, Paragon expressed its desire "to obtain delivery and purchase [of] certain quantities of" Calvert flat-rolled steel and other products "on a consignment basis." (**Ex. B**, Consignment Agreement § 1, Annex I.) The consigned inventory was defined, collectively, as the "Products." (*Id.*, § 1.)

30. Section 2.1 of the Consignment Agreement described "the consignment procedures" for the Products on Annex II to that agreement. In relevant summary, that procedure required: (a) Paragon to "submit VMI (Vendor Managed Inventory) purchase orders separately from regular purchase orders" for all consigned inventory; (b) Calvert to ship the consigned Product to Paragon, but not transfer ownership; (c) Paragon to record the received consignment inventory; (d) Paragon to account for sold material (or consigned inventory held for more than 180 days) both on a shared computer platform and in a weekly report to Calvert.

31. Products are "withdrawn from the consigned inventory," and payment is due to Calvert on the earlier of "the date such Products[:] (i) are used or sold by [Paragon], (ii) are commingled with other assets of [Paragon] or any other party, (iii) are purchased by [Paragon] as provided for in [the Consignment] Agreement and paid in full, (iv) Product volume reaches 100%

fulfilment of a single purchase order, or (v) 180 days after the Products arrive at" Paragon. (*Id*., § 3.)

32. Paragon promised "[a]t all times that Products are in the possession or control of [Paragon] and not yet paid for," Paragon "shall always maintain all Products at the Yard and shall not relocate or permit the relocation of the Products from such locations, other than to promptly transport the Products from the unloading area to the segregated storage area in accordance with Section 2.2." (*Id*., § 4.1.)

33. Paragon also agreed, "[u]pon reasonable notice and at reasonable times," to give Calvert "access to [Paragon's] records concerning the amount and identification of the Products" and the right to "inspect and perform physical inventory" of the Products (*id*.); to "clearly identify the Products as the property of [Calvert] on such Product" (*id*., § 4.2); and to "segregate any Products from any other personal property of [Paragon] or that of any third parties[.]" (*Id*.)

**V. <u>Default of the Consignment Agreement by Paragon</u>**

34. Calvert fully performed its obligations under the Consignment Agreement and provided all Products identified in the Consignment Agreement.

35. Paragon accepted delivery of the Products pursuant to the Consignment Agreement without protest; however, it failed to fulfil its obligations under the Consignment Agreement.

36. Paragon has not provided weekly reports regarding any sold materials as is required under the Consignment Agreement. Nor has it paid for any Products sold.

37. In or around March or April of 2024, Calvert attempted to physically inspect the Products at Paragon's facilities, as permitted by the terms of the Consignment Agreement.

38. Calvert was not permitted to physically inspect the Products as some or all were apparently stored at a different location, even though relocation of the Products is not permitted under the Consignment Agreement.

39. More than 180 days have passed since delivery of the Products by Calvert, and Paragon owes Calvert for the full amount of the Products taken by Paragon pursuant to the Consignment Agreement.

## COUNT ONE:
## BREACH OF THE TERMS & CONDITIONS AND INVOICES

40. Calvert realleges and incorporates Paragraphs 1 through 39, as if fully rewritten in this Paragraph.

41. The Terms & Conditions and Invoices are valid and binding contracts.

42. Calvert fully performed its obligations under the Terms & Conditions and Invoices and provided all products identified in the Invoices.

43. Paragon accepted all products identified in the Invoices.

44. Pursuant to the terms of the Terms & Conditions and Invoices, the full amount due under the Invoices became due and payable upon Paragon's breach of the Agreement by failing to timely remit payments on the Invoices.

45. Pursuant to the terms of the Terms & Conditions and Invoices, Paragon was obligated to render payments within thirty (30) days from the date of each of the Invoices.

46. Paragon is in breach of its obligations by failing to timely pay all amounts due as agreed.

47. Accordingly, Paragon's breach of the Terms & Conditions and Invoices directly and proximately caused Calvert $15,482,327.54, plus interest, in damages, which remains unpaid and due, along with interest as well as all fees, costs, and expenses incurred by Calvert during this litigation, including reasonable attorneys' fees and court costs.

**COUNT TWO:**
**UNJUST ENRICHMENT (ALTERNATIVE TO COUNT ONE)**

48. Calvert realleges and incorporates, Paragraphs 1 through 47, as if fully rewritten in this Paragraph.

49. As an alternative theory of recovery to Count One, and in the event that there would be no adequate remedy at law, Calvert conferred on Paragon the benefits of the provision of products and related services.

50. Paragon accepted and appreciated the benefits conferred upon it by receipt of products delivered by Calvert.

51. Under the present circumstances, in particular Paragon's failure to pay for the products delivered, it would be inequitable for Paragon to retain the benefits conferred by Calvert without full payment to Calvert, for the value of those benefits.

52. Paragon has been unjustly enriched by receiving the benefit of the products provided without reimbursing Calvert.

53. Accordingly, Paragon has caused Paragon $15,482,327.54, plus interest, in damages, which remains unpaid and due.

**COUNT THREE:**
**BREACH OF THE CONSIGNMENT AGREEMENT**

54. Calvert realleges and incorporates Paragraphs 1 through 53, as if fully rewritten in this Paragraph.

55. The Consignment Agreement is a valid and binding contract.

56. Calvert fully performed its obligations under the Consignment Agreement and provided all Products identified in the Consignment Agreement.

57. Paragon accepted all Products identified in the Consignment Agreement.

58. Pursuant to the terms of the Consignment Agreement, Paragon is required to account for sold material (or consigned inventory held for more than 180 days) and provide a weekly report to Calvert.

59. Pursuant to the terms of the Consignment Agreement, upon the passage of 180 days from the date of delivery, the Consignment Agreement will terminate, and Paragon will be deemed to have purchased any remaining inventory and will be invoiced for the product.

60. Pursuant to the terms if the Consignment Agreement, Paragon was not permitted to relocate the Products from the agreed upon location unless it was to transport them for delivery purposes.

61. Paragon is in breach of its obligations by failing to properly account for the consigned goods, relocating the goods, and failure to timely pay all amounts due upon the termination of the Consignment Agreement, as agreed.

62. Accordingly, Paragon's breach of the Consignment Agreement directly and proximately caused Calvert damages of $16,112,893.86, plus interest, which remains unpaid, due, and owing.

**COUNT FOUR:**
**CONVERSION OF CHATTEL (ALTERNATIVE TO COUNT THREE)**

63. Calvert realleges and incorporates Paragraphs 1 through 62, as if fully rewritten in this Paragraph.

64. As an alternative theory of recovery to Count Three, and in the event that there would be no adequate remedy at law, Paragon took possession of and used the Products as its own without remitting payment.

65. Paragon took possession of the Products with the intent to use the Products as its own, as demonstrated by the failure to meet any of its obligations under the Consignment Agreement.

66. Paragon has maintained possession of the Products and has failed to remit any payment to Calvert.

67. Accordingly, Paragon has caused Calvert damages of $16,112,893.86, plus interest, which remains unpaid, due, and owing.

**PRAYER FOR RELIEF**

68. WHEREFORE, Calvert respectfully requests that this Court enter judgment against Paragon and in favor of Calvert, as follows:

a. An award of damages for Paragon's breach of the Terms & Conditions and Invoices in the amount of $15,482,327.54, plus interest;

b. An award of damages for Paragon's breach of the Consignment Agreement in the amount of $16,112,893.86, plus interest;

c. An order requiring a full and complete reconciliation of all consigned inventory in Paragon possession;

d. An award of all fees, costs, and expenses incurred by Calvert during this litigation, including reasonable attorneys' fees and court costs; and

e. Any other appropriate relief that this Court deems just and equitable.

Dated: September 27, 2024

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

*/s/ Johanes Maliza*

Johanes Maliza
71 South Wacker Drive
Suite 1600
Chicago, Illinois 60606
Telephone: (312) 212-4949
Facsimile: (312) 767-9192
jmaliza@beneschlaw.com

*-and-*

Andrew G. Fiorella
(*Pro hac vice* forthcoming)
Vincent J. Michalec
(*Pro hac vice* forthcoming)
127 Public Square, Suite 4900
Cleveland, Ohio 44114-2378
Telephone: (216) 363-4500
Facsimile: (216) 363-4588
afiorella@beneschlaw.com
vmichalec@beneschlaw.com

*Attorneys for Plaintiffs AM/NS Calvert LLC And AM/NS Calvert Receivables LLC*